In re: SULZER HIP PROSTHESIS
AND KNEE PROSTHESIS
LIABILITY LITIGATION

No. 1:01–CV–9000.
MDL DOCKET NO. 1401.

United States District Court,
N.D. Ohio,
Eastern Division.

June 12, 2003.

Charles R. Parker, Hill & Parker, Houston, TX, Daniel E. Becnel, Jr., Reserve, LA, David W. Zoll, Zoll & Kranz, Toledo, OH, Debra J. Horn, Meyers, Roman, Friedberg & Lewis, Cleveland, OH, Don Barrett, Barrett Law Office, Lexington, MS, James R. Dugan, II, Gauthier, Dowing, Labarre, Beiser & Dean, Metairie, LA, Janet G. Abaray, Lopez Hodes Restaino Milman Skikos Polos, Cincinnati, OH, John R. Climaco, Climaco Lefkowitz Peca Wilcox & Garofoli, Cleveland, OH, John T. Murray, Murray & Murray, Sandusky, OH, Keith M. Fleischman, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, Lee Squitieri, Squitieri & Fearon, New York, NY, Mary B. McKee, Hickman & Lowder, Cleveland, OH, Phillip A. Ciano, Ciano & Goldwasser, Cleveland, OH, R. Eric Kennedy, Weisman, Kennedy & Berris, Cleveland, OH, Richard S. Wayne, Strauss & Troy, Cincinnati, OH, Stanley M. Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, Stephen B. Murray, Jr., Murray Law Firm, New Orleans, LA, Steven M. Tindall, Lieff, Cabraser, Heimann & Bernstein, San Francisco, CA, Sylvia Antalis Goldsmith, Murray & Murray, Sandusky, OH, Timothy J. Gallagher, Schwarzwald & McNair, Cleveland, OH, for plaintiff in Sulzer Orthopedics Inc. Hip Prosthesis and Knee Prosthesis Products Liability Lit.

John L Davidson, Frazer Davidson, P.A., Jackson, MS, Michael E. Cox, Biloxi, MS, for Thomas Reynolds, Gradys Hodge.

Glen Edward Hazen, Jr., Morgan, Hazen & Galbreath, Cincinnati, OH, Laura Citrano, Iverson Yoakum Papiano & Hatch, Los Angeles, CA, Neil Papiano, Iverson Yoakum Papiano & Hatch, Los Angeles, CA, Tracy Annette Smith, Morgan, Hazen & Galbreath, Cincinnati, OH, for Matthew Murnane, Carletta Murnane.

Frank Hilton–Green Tomlinson, Pritchard, McCall & Jones, Birmingham, AL, K. Dee Hutsler, III, Birmingham, AL, for Intervenor plaintiff in Sulzer Orthopedics Inc. Hip Prosthesis and Knee Prosthesis Products Liability Lit.

David W. Brooks, Shook, Hardy & Bacon, Kansas City, MO, J Patrick Herald, James J. Dries, Richard M. Franklin, Baker & McKenzie, Chicago, IL, Jeffrey M. Whitesell, Arter & Hadden, Cleveland, OH, for Sulzer Medica Ltd., Sulzer Orthopedics Ltd., Sulzer USA Holding Co.

Bradley D. Honnold, Harvey L. Kaplan, Matthew D. Keenan, David W. Brooks, Shook, Hardy & Bacon, Kansas City, MO, Irene C. Keyse–Walker, Jeffrey M. Whitesell, Arter & Hadden, Cleveland, OH, Richard F. Scruggs, Scruggs Law Firm, Pascagoula, MS, Robert C. Tucker, Arter & Hadden, Cleveland, OH, Sidney A. Backstrom, Pascagoula, MS, Steven J. Boranian, Reed Smith Crosby Heafey LLP, San Francisco, CA, for Sulzer Orthopedics Inc., Sulzer Orthopedics Incorporated Sulzer Medica USA Inc.

Bridget M. Brennan, Mary M. Bittence, Baker & Hostetler, Cleveland, OH, Werner L. Polak, Shearman & Sterling, New York, NY, for Sulzer A.G.

Jerome L. Skinner, Stanley M. Chelsey, Waite, Schneider, Bayless & Chelsey, Cincinnati, OH, for Movant in Sulzer Orthopedics Inc. Hip Prosthesis and Knee Prosthesis Products Liability Lit.

Mark M. Sandmann, Rawlings & Associates, Louisville, KY, for Blue Cross Blue Shield of Louisiana.

Robert J. Fogarty, Hahn, Loeser & Parks, Cleveland, OH, Thomas. A. Cunniff, Fox, Rothschild, O'Brien & Frankel, Princeton, NJ, for Aetna, Inc. & Cobalt Corp.

Eileen R. Ridley, R. Gregory Cochran, Foley & Lardner, San Francisco, CA, for Hill Physicians Medical Group, Inc.

Cullen D. Seltzer, Lynn C. Greer, BrownGreer, Richmond, VA, for James J. McMonagle.

## MEMORANDUM AND ORDER

O'MALLEY, District Judge.

With this Order, the Court enters Attorney Fee Awards to certain attorneys in connection with their efforts to confer a Common Benefit to the Plaintiff Class in this Multi–District Litigation Class Action Settlement. The specific Fee Awards for each attorney are listed in the chart at the end of this Order.

As explained further below, the parties and the Court reserved a maximum of $50 million, out of a total settlement of over $1 billion, for the payment of Common Benefit Attorney Fee Awards. The total of the Fee Awards authorized by this Order is $30,232,300.00. In addition, the Court estimates it *may* authorize additional Fee Awards to certain attorneys in the amount of about $12,650,000.00, but the Court is withholding the entry of those awards at this time.[1] Assuming the Court's estimate

---

1. As discussed below at pages 32–36 of this opinion, the Court is withholding the award and disbursement of common benefit fees to certain attorneys who, though they have otherwise earned such awards, appear to be engaging in conduct that works to the common *detriment* of the plaintiff class. The amount actually awarded as common benefit fees to these attorneys may be much lower than the Court's estimate. The Court **ORDERS** these

of additional Fee Awards is accurate, this leaves a remainder of $7,117,700.00 (out of the $50 million reserve). The Court **DIRECTS** the Claims Administrator and the Trustee of the Sulzer Settlement Trust to continue to hold in reserve this entire $7,117,700.00 amount for payment of certain costs associated with effectuating the settlement and, if possible, distribution to the settlement class.[2]

With regard to the specific, individual Fee Awards authorized by this Order, the Court further **DIRECTS** as follows. First, the Claims Administrator and the Trustee of the Sulzer Settlement Trust shall promptly **COMPLY** with sections 5.4 and 5.6 of the Settlement Agreement, which directs that these Fee Awards "shall be paid to liaison Class Counsel, who shall distribute such amounts to [the appropriate] Common Benefit Attorneys," and states that the Fee Awards "shall be paid out of the [proceeds from the] CCI."

Second, **if an individual attorney desires an explanation of how the Court applied the relevant factors to reach its conclusion regarding his *own* common benefit fee award, the attorney *must* file a formal request therefor within ten calendar days of the date of this Order.** The Court will then issue a brief written explanation, which will become an appendix to this Order.[3] The Court will provide a personal explanation only if requested by the attorney who actually submitted the common benefit Fee Application (or his law firm).

Except as noted in footnote 1 above, and pursuant to Fed.R.Civ.P. 58, this Order entering Fee Awards is a final appealable Order.

## I. Background.

### A. The Defective Products.[4]

Sulzer Orthopedics, Inc. ("Sulzer Orthopedics") is a Texas-based designer,

---

applicants to file a formal explanation with the Court, within 14 days of the date of this Order, addressing these concerns; *see* footnote 34, below. The Court may then enter common benefit fee awards to these attorneys. The time within which an attorney may file an appeal of his Common Benefit Fee Award begins to run on the date the Court actually enters the award; accordingly, **this Order does *not* trigger the appeal period for those attorneys whose award (if any) is currently "withheld."**

2. The Court expects that some of this reserve amount will be used to reimburse Plaintiffs' Liaison Class Counsel (at a reasonable hourly rate) for attorney fees incurred in connection with its continued work with the Claims Administrator. Some of this amount also may be used, to the extent necessary, to defray Claims Administration costs, which are higher than expected. With regard to this latter item, the Settlement Agreement provides that "the Claims Administrator shall first use any amounts remaining in any particular Fund after satisfaction of all obligations to Class Members to either pay for or create a reserve for payment of all administrative expenses

that have been or will be incurred in connection with the winding-up of the administration of the Sulzer Settlement Trust." Agreement at § 15.6. Finally, any portion of the reserve not needed to cover these Trust administrative expenses will be distributed in accordance with § 5.2 of the Settlement Agreement, which states that, "[i]n the event there are any amounts remaining in the Plaintiffs' Counsel Sub–Fund after all applicable amounts have been paid to Plaintiffs' Counsel, such remaining amount shall be distributed pro rata among all Class Members who received benefits pursuant to Sections 3.4(a), 3.5(b), 3.5(c) and 3.7(a)."

3. The issuance of any such explanatory appendix will *not* extend the period of time for filing an appeal.

4. The Court recognizes that the defect was merely alleged and never proved at trial. For ease of reference, however, and in light of Sulzer Orthopedics' voluntary recall and certain apparent concessions made, the Court occasionally refers in this memorandum to the medical devices as "defective," rather than "allegedly defective."

manufacturer, and distributor of orthopedic implants for hips, knees, shoulders, and elbows. During the relevant time-frame, Sulzer Orthopedics was wholly owned by Sulzer Medica USA Holding Company ("Sulzer Medica USA"), and Sulzer Medica USA was wholly owned by Sulzer Medica Ltd. ("Sulzer Medica"), a Swiss company. Sulzer AG, another Swiss company, owned 74% of Sulzer Medica.[5]

One of the products manufactured by Sulzer Orthopedics is known as the "Inter-Op acetabular shell," which is one component of a system used for complete hip replacements. Specifically, the Inter-Op shell is a socket-like device inserted into the acetabulum, which is a part of the pelvis; the shell is designed to receive a separate, ball-like device, which is inserted into the femur, or thigh bone. The two components thereby replace the articulating ball-and-socket structure of the hip joint. The Inter-Op shell is regulated by the federal Food and Drug Administration ("FDA").

Proper surgical attachment of these replacement components in the body is critical. Orthopedic implants are often cemented or screwed into position. Some implants are also designed to allow the bone to grow into and around them, holding them securely in place. The Inter-Op acetabular shell was designed to bond with the natural bone.

Unfortunately, a manufacturing defect apparently prevented some of Sulzer Orthopedics' Inter-Op shells from bonding with the acetabulum. In early December of 2000, Sulzer Orthopedics announced a voluntary recall of certain manufacturing lots of its Inter-Op shells. Most of the recalled products were manufactured during or after October of 1999, but a limited number were produced as early as June of 1997. The recall stated that Sulzer Orthopedics had "received reports of post-operative loosening" of some of the Inter-Op shells, apparently "related to a reaction of the [human] body to a slight residue of lubricant used in the manufacturing process." Sulzer Orthopedics recalled approximately 40,000 units of its Inter-Op shell, of which about 26,000 had already been implanted in patients. About 90% of these implants occurred in the United States. With regard to the recalled units, Sulzer Orthopedics "reprocessed" some of them—that is, "re-cleaned" about 16,500 of the never-implanted, recalled shells—and then resold them. About 6,100 of these reprocessed units were implanted.

One of the documents issued by Sulzer Orthopedics in connection with the voluntary recall included the following explanation:

> Sulzer Orthopedics is the manufacturer of a hip implant that you received during hip replacement surgery. We sincerely regret to inform you that we have recently learned that a small number of the many implant parts that we manufactured may have a trace of lubricant residue on the surface that was not completely removed during the manufacturing process.

\*      \*      \*      \*      \*      \*

---

**5.** On July 10, 2001, during the course of this litigation, Sulzer AG divested itself of all but about 5% of its shares in Sulzer Medica. On June 1, 2002, Sulzer Medica, Sulzer Orthopedics, and several related entities changed the "Sulzer" and "Sulzer Medica" portions of their names to "Centerpulse." The name may change again soon: on April 16, 2003, the British firm Smith and Nephew Group plc announced a tender offer to shareholders of Centerpulse Ltd; on May 20, 2003, the Swiss firm Zimmer Holdings, Inc. announced a competing tender offer. For the sake of consistency with the Court's prior Orders, this Order uses the old "Sulzer" monikers.

The hip implant part is the acetabular "shell" which was implanted into the upper part of your hip called the acetabulum. Normally, the bone would form an integrated bond with the shell; however, it appears that bone does not always bond with shells when the lubricant residue is present. Reported symptoms include severe groin pain and inability to bear weight on your leg. These symptoms are caused by the shell being loose from the bone. Only a small number of patients who received the shell during their total hip replacement have experienced loosening of the shell. In fact, to date, over 3,300 of the patients who received implants of the defective Inter–Op shells have undergone "revision surgery"—removal of the defective implant and replacement with a new one.[6] For a variety of reasons, not all of the patients who were implanted with recalled Inter–Op shells will undergo revision surgery. For example, some patients will not experience any bone-bonding failure; other patients may suffer severe failure but be medically ineligible for revision surgery. The best evidence, however, shows that, as of today, all of those medically eligible patients needing revision surgery to replace defective Inter–Op acetabular shells have already undergone it.

After Sulzer Orthopedics discovered the problem with the Inter–Op shells, the company reviewed its manufacturing processes for its other medical implant products. This review led Sulzer Orthopedics to discover that it had used a similar manufacturing process during its fabrication of an implant product known as the Natural Knee II Tibial Baseplate.[7] Just as it did with the Inter–Op shell hip implants, Sulzer Orthopedics voluntarily notified the public that a problem existed with certain Natural Knee tibial baseplates. Specifically, on May 17, 2001—about five months after it had announced the voluntary recall of the Inter–Op shells—Sulzer Orthopedics sent a "Special Notification Letter" to surgeons who had implanted certain identified "Natural Knee II Porous–Coated Stemmed Tibial Baseplates." The purpose of this Notification was to make the surgeons aware of "unanticipated adverse clinical outcomes" associated with these baseplates—specifically, "aseptic loosenings," similar in nature to what had occurred with the Inter–Op acetabular shell hip implants. In addition to issuing this Notification, Sulzer Orthopedics also asked its distributors and sales agents to return any Natural Knee baseplates manufactured from July 2000 to December 2000 that had not already been implanted. Sulzer did not "reprocess" any Natural Knee baseplates. The manufacturing defect occurred during production of about 1,600 Natural Knee baseplates, about 1,300 of which were implanted in patients. As of today, over 580 revision surgeries for the Natural Knee baseplate implants have occurred. As with the Inter–Op shells, Sulzer Orthopedics now estimates that virtually all of those medically eligible patients who will need revision surgery to replace the defective Natural Knee baseplates have already undergone it.

## B. The Multi–District Litigation.

Shortly after Sulzer Orthopedics issued its voluntary recall of its Inter–Op shells in December of 2000, a number of plaintiffs around the country filed lawsuits, in both state and federal courts. By August

---

**6.** In addition, about another 125 patients who received "reprocessed" Inter–Op shells have undergone revision surgery.

**7.** The "tibial baseplate" is one of four primary parts used for a total knee replacement. In addition to the "tibial baseplate," a total knee replacement system is comprised of a femoral component, a patella component, and a tibia baseplate insert.

31, 2001, there were pending about 1,300 civil suits nationwide, about 200 of which were in federal court. These cases involved about 2,000 named plaintiffs, primarily including implant recipients and their spouses. Over 90% of the state court actions were filed in California, Texas, Florida, or New York. About 19 of the state court cases were styled as class actions, as were about 34 of the federal court cases. The defendants named in these lawsuits included not only Sulzer Orthopedics, but also: (1) Sulzer Medica USA; (2) Sulzer Medica;[8] (3) Sulzer AG; (4) various other Sulzer-related entities; and (5) various surgeons, hospitals, and medical supply companies connected to the distribution or implantation of the defective product. The causes of action in these lawsuits included claims for defective design, marketing, and manufacture; breach of express and implied warranties; negligence; strict liability; and other legal theories of recovery. On August 30, 2001, the first of these cases to go to trial ended with a substantial plaintiffs' verdict.[9]

Similarly, shortly after Sulzer Orthopedics issued the voluntary recall of its Natural Knee II implants, patients who had received these implants also filed lawsuits around the country, in both state and federal court. Specifically, as of October 19, 2001, plaintiffs had filed claims related to defective knee implants in 27 state court actions and 5 federal actions; three of these 32 lawsuits were putative class actions. These cases involved the same defendants and the same legal theories as the cases involving the Inter–Op shells.

In early 2001, pursuant to 28 U.S.C. § 1407, three different federal plaintiffs with Inter–Op shell hip implants filed motions with the Federal Judicial Panel on Multi–District Litigation ("MDL Panel"), seeking to consolidate and centralize 30 of the federal lawsuits. MDL docket no. 1401. On June 19, 2001, the MDL Panel granted these motions, consolidating and transferring all related pending federal litigation to the Northern District of Ohio and assigning oversight of the MDL proceedings to the undersigned. Initially, the consolidated litigation involved only cases related to the Inter–Op shells. On September 5, 2001, however, the MDL Panel transferred to this Court a case involving a Natural Knee tibial baseplate implant, because it involved questions of fact similar to those in the Inter–Op shell cases. Eventually, virtually all of the federal cases involving the Inter–Op shells and Natural Knee baseplates were transferred to this Court.[10]

### C. The Initial Class Settlement.

On July 7, 2001, the Court issued an Order setting out the "practices and procedures" it would follow during its administration of the MDL proceedings. *See* docket no. 3. Among other things, this Order: (1) temporarily appointed liaison and co-lead counsel for plaintiffs;[11] (2) set

---

**8.** Sulzer Medica Ltd. (now known as Centerpulse) is a publicly traded company, listed on the New York Stock Exchange under the symbol "CEP."

**9.** Trial began on August 20, 2001 in the Nueces County, Texas state court case of *Rupp v. Sulzer Orthopedics, Inc.*, no. 01–60581–4, ending in a verdict for three plaintiffs exceeding $15 million on August 30, 2001. Notably, these state court proceedings involved only Sulzer Orthopedics, Inc. as a defendant, and did not involve claims against

Sulzer Medica, Sulzer AG, or any other related entity.

**10.** As of the date of this Order, over 400 federal cases have been transferred to this Court.

**11.** The Court appointed as liaison counsel R. Eric Kennedy. The Court appointed as co-lead counsel Mr. Kennedy, John Climaco, and Stanley Chesley. The Court later appointed as class co-counsel Mr. Climaco, Mr. Kennedy, Mr. Chesley, Donald Barrett, Keith

an initial case management conference for August 17, 2001; and (3) directed counsel to submit an agenda for this conference, to include a discovery plan and also proposed deadlines for amendment of pleadings, expert and non-expert discovery, dispositive motions, expert reports, and so on. Shortly before this conference, however, counsel for the parties informed the Court that they planned to submit an agenda including another significant item: discussion of a proposed class certification and class settlement. The parties then filed, among others, motions for an order conditionally certifying a class, and motions for preliminary approval of a class settlement. As the Court had previously required, plaintiffs' liaison counsel forwarded copies of these motions, including a copy of the proposed settlement agreement, to counsel for all plaintiffs whose cases had been consolidated in the MDL proceedings. In addition, plaintiffs' liaison counsel made available the same materials to virtually every plaintiffs' counsel pursuing litigation against Sulzer·Orthopedics, both in federal and state court.

Given the quickly changing nature of the litigation, the Court used the initial case management conference to question the parties in open court regarding their motions for class certification and class settlement. The Court directed its questions to plaintiffs' liaison and co-lead counsel, and also defendants' counsel. Given the wide publication of the pending motions, about 125 attorneys from around the country, representing plaintiffs and groups of plaintiffs, also attended the hearing. The Court heard from those proposing preliminary certification and approval, and also heard from a number of counsel, including counsel representing the interests of various state court plaintiffs who were not parties to the MDL proceedings but whose interests could be affected by class treatment of the Sulzer-related claims. Some spoke strongly in favor of the proposed certification and settlement, while others strongly opposed it.

During the course of this hearing, it became apparent that the proposed settlement agreement, as drafted, contained provisions that did not accurately reflect the understanding of the parties. Accordingly, the Court directed the parties to submit an amended proposed class settlement agreement by August 24, 2001. The Court then indicated it would allow any interested person (including persons not parties to any federal proceeding) wishing to offer additional objections to the proposed class and amended proposed class settlement agreement to submit their positions in writing by August 24, 2001. The Court received about 41 such comments, all of which it reviewed in detail. On August 28, 2001, the Court held an additional hearing on the pending motions for class certification and preliminary approval of class action settlement. Ultimately, on August 29, 2001, the Court granted the motions for conditional certification of an opt-out settlement class and preliminary approval of the proposed settlement agreement. The settlement class included, essentially, all Americans in whom were implanted a recalled Inter–Op acetabular shell, together with their loved ones. The settlement class at this juncture did *not* include patients who had received a Natural Knee tibial baseplate implant, in large part because the Court did not yet have jurisdiction over any "knee claimant"—the MDL Panel had not yet transferred to the Court a "knee case."

Although the Court did preliminarily conclude that the proposed settlement was fair and reasonable and adequate, it was

---

Fleischman, Richard Wayne, Wendell Gauthier, and Daniel Becnel. *See* docket nos. 20 &

57. James Dugan, II was later substituted for Wendell Gauthier. *See* docket no. 171.

clear that a substantial number of plaintiffs and their counsel disagreed and intended, at that juncture, to opt out.[12] The settlement agreement to which the Court gave preliminary approval on August 29, 2001 contained the following basic elements, set out here in simplified fashion:

● The parties would create a "Settlement Trust," which would administer a Research Fund, a Medical Monitoring Fund, a Patient Benefit Fund, and an Extraordinary Injury Fund.

● The defendants would put $4 million in cash into the Research Fund, to be used for "medical research relating to reconstructive orthopedic implants ... for the benefit of Class Members."

● The defendants would put $20 million in cash into the Medical Monitoring Fund, to be used to monitor the implants of claimants who had not yet undergone revision surgery.

● The defendants would put at least $361.5 million in cash and stock into the Patient Benefit Fund, to pay compensation to implantees and their associated consortium claimants, as follows:

— to claimants who did not have revision surgery, $750 in cash, $2,000 in stock, and $500 to their spouses.

— to claimants who had one revision surgery, $37,500 in cash, $20,000 in stock, and $5,000 to their spouses.

— to claimants who have more than one revision surgery, $63,500 in cash, $34,000 in stock, and $5,000 to their spouses.

● The defendants would put another $125 million in cash into the Patient Benefit Fund, to pay for any medical expenses a claimant incurred in connection with revision surgery (or to pay related subrogation claims).

● The defendants would provide $33.3 million in cash and stock as payment of attorney fees to claimants' individual attorneys, at the rate of 1/3 of the claimants' compensation.

● The defendants would provide $4.5 million in cash to cover the costs of administration of the Settlement Trust.

● The defendants would put a minimum of $30 million in cash and stock into the Extraordinary Injury Fund, to pay for additional compensation to implantees and their associated consortium claimants, and any amounts not paid out of the other Funds would be transferred into the Extraordinary Injury Fund.

● To pay the amounts listed above, the defendants would: (a) put all available insurance proceeds into the Settlement Trust; (b) put all available cash into the Settlement Trust, except for one month's working capital; (c) put the required number of stock shares into the Settlement Trust; and (d) put 50% of their net annual income into the Settlement Trust.

● If the defendants settled a case with an opt-out claimant on terms more favorable than those received under the Settlement Agreement by participating claimants, then the defendants would pay all participating claimants the increment.

There are three other notable aspects of the settlement agreement which the Court preliminarily approved on August 29, 2001. First, with regard to the Sulzer Medica

12. Indeed, many plaintiffs sent notice to the Court purporting to opt out immediately. The Court was forced to issue an Order reminding plaintiffs and their counsel that they could not make an informed decision whether to opt out until after the terms of the settlement agreement had been finalized and Final Class Notice had been issued—that is, until after counsel could inform their clients precisely what they were opting out of. *See* docket no. 81.

stock that the defendants would pay into the Settlement Trust, the stock was to have a minimum guaranteed value—specifically, the defendants would transfer to the Settlement Trust a certain number of American Depositary Receipts ("ADRs"), valued at $5.10 per ADR. The Settlement Agreement provided that, if the value of an ADR fell below $5.10 at the time of funding, the defendants would make up the difference. Thus, if the value of the stock increased, the value of the Settlement would increase; if the value of the stock decreased, the defendants would put into the Settlement Trust proportionately more stock, so that the total value of the stock would not fall below a certain "floor." Assuming a "guaranteed" value of $5.10 per ADR, the total "funding value" of the settlement was about $598 million,[13] with about 35% of this value in the form of stock. The actual value of the stock, of course, would fluctuate, depending on the fortunes of Sulzer Medica.

Second, the parties estimated that it would take the Settlement Trust about six years to pay out all amounts owed. During this six-year interval, Sulzer Orthopedics would place liens on virtually all of its assets in favor of the Settlement Trust, to secure all of its obligations. This provision was especially unpopular with certain attorneys, who believed it worked to the disadvantage of opt-out plaintiffs.

And third, the settlement agreement was designed with the understanding that plaintiffs' counsel would have a period of time to pursue further discovery regarding the defendants' financial wherewithal. That is, the defendants agreed to make available all information reasonably requested by the plaintiffs that would reveal: (1) all of the assets of Sulzer Orthopedics, its parent Sulzer Medica USA, and its Swiss grandparent, Sulzer Medica Ltd.; (2) all of the insurance policies held by these entities that might be available to pay claims; and (3) the likelihood the plaintiffs could "pierce the corporate veil" and pursue claims against Sulzer Orthopedics' "great grandparent," Sulzer AG. As the Court explained in its Order granting conditional approval:

> If plaintiffs conclude that the information they obtain through this discovery shows there is more money available to pay plaintiffs than is currently contemplated by the settlement agreement, then the plaintiffs can withdraw from the agreement, or insist it be modified to account for those other sources of payment; class counsel has assured the Court, in fact, that plaintiffs will withdraw from the proposed agreement if they conclude that the defendants are contributing to this settlement less than substantially all of their available and reachable assets.

> Furthermore, the parties contemplate sharing all of this discovery information with counsel for all class members, including counsel appearing only in state court. This arrangement will ensure an extremely thorough viewing of the defendants' financial circumstances by those persons most interested in ensuring that, in fact, the defendants are "suffering" the maximum judgment they can withstand.

It is also notable that, by virtue of the settlement agreement, at least one of the defendants (Sulzer Medica Ltd.) is forgoing jurisdictional defenses and contributing to the funds available to the class. It appears that a strong argument can be made that the total judgment available to the plaintiffs pursuant

---

**13.** This "funding value" did not include amounts the defendants would pay for subrogation claims, unreimbursed medical expenses connected with revision surgery, common benefit attorney fees, and other amounts.

to the settlement agreement is far larger than the sum of any judgments they could ever collect individually. This, again, is an assumption that will be subject to challenge by way of the fairness hearing and discovery process.

Order at 38–39 (docket no. 61).

### D. The Final Class Settlement.

Shortly after the Court preliminarily approved the settlement agreement, the defendants moved for an order enjoining all state court litigation. The Court granted this motion, as the Court was convinced that, "given the [then-]current posture of this action, allowing the state court plaintiffs to pursue their parallel state court actions [would] frustrate the proceedings in this case and disrupt the orderly resolution of the MDL litigation." Order at 7 (docket no. 72). Indeed, it was apparent that, absent a stay, the continuing legal defense costs alone would seriously impair the defendants' ability to pay anything to the Plaintiff Class, and one or more of the Sulzer defendants would likely declare bankruptcy. Given that the average age of a class member was over 60 years old, a bankruptcy would decrease severely the likelihood that class members would receive compensation during their lifetimes.

One of the effects of the Court's stay enjoining the continuation of all state court litigation was to preclude some very able attorneys, who had vigorously pursued related litigation only in state courts, from continuing their discovery efforts. Accordingly, the Court appointed ten lawyers to a Special State Counsel Committee

("SSCC"), for the purpose of "assist[ing] in and/or monitor[ing] the discovery process." Order at 1 (docket no. 129).[14] These lawyers, who represented class members but did not have a federal case pending within the MDL, joined plaintiffs' class counsel in the MDL to engage in substantial discovery and strenuous negotiation with counsel for the defendants. As class counsel had hoped, this discovery and negotiation did uncover additional sources of payment and a more accurate understanding of the defendants' finances. In particular, the attorneys working on behalf of the plaintiffs made three critical gains during their MDL discovery period: (1) although no plaintiff had yet succeeded at obtaining jurisdiction over the "great-grandparent company," Sulzer AG, the plaintiffs obtained a settlement commitment from Sulzer AG of $50 million in cash and over 480,000 shares of Sulzer Medica stock;[15] (2) although there were some potent full or partial legal defenses available to Sulzer's insurance companies, known collectively as Winterthur, the plaintiffs obtained a commitment from Winterthur to provide a total of over $215 million toward the settlement; and (3) the Sulzer defendants revealed *voluntarily*, in unprecedented detail, their total financial condition.

After the Court entered its Order staying state court litigation, class counsel moved to file an amended complaint, adding "knee claimants" to the class. On October 19, 2001, the Court granted this motion and conditionally certified an amended class that included recipients of

14. The Court initially appointed Chad Roberts, Morris Bart III, Perry Weitz, Ed Blizzard, J. Graham Hill, Zona Jones, Scott Nabers, Ramon Lopez, and Mark Robinson, Jr. to the SSCC. Docket no. 129. The Court later added Richard Heimann. Docket no. 364.

15. The value of this stock on May 2, 2002, just before the Court held its Final Fairness Hear-

ing, was about $51 million. In addition to the jurisdictional defenses available to Sulzer AG, plaintiffs' counsel's negotiations also had to account for the high likelihood that litigation against Sulzer AG would not be fruitful because it would be difficult to pierce the corporate veil, and also difficult to collect any judgment from this Swiss entity.

both Inter–Op shells and Natural Knee tibial baseplates, together with their derivative claimants.[16] *See* docket no. 128.

After having completed their discovery and negotiations, the parties submitted a new proposed settlement agreement. The Court conditionally approved this proposed agreement, and scheduled a final fairness hearing. Although the size of the Plaintiff Class exceeded 30,000 individuals (not including derivative claimants), the Court received only 30 or so objections to the fairness of the revised settlement agreement, and all but seven objections were withdrawn before the final fairness hearing. Among the witnesses at this hearing were a number of attorneys, representing hundreds of class members, who had vehemently objected to the first proposed settlement agreement; these attorneys now testified in *support* of the final proposed settlement agreement. Indeed, there was *no* witness who testified in opposition to the final proposed settlement agreement and no attorney who argued against its approval. On May 8, 2002, the Court entered an Order granting final certification to the national Plaintiff Class and subclasses, and granting final approval to the settlement agreement between the Plaintiff Class and the Sulzer Defendants. *See* docket no. 340.

Because this Final Settlement Agreement provided that the Sulzer defendants retained the right to terminate and withdraw from the Agreement at any time prior to May 31, 2002, the Court's May 8, 2002 Order was not a final, appealable Order. After the Sulzer Defendants elected not to exercise their right to terminate the Agreement, however, the Settlement Agreement became irrevocable and the Court entered an Order on June 4, 2002, confirming its May 8, 2002 Order and dismissing all settled claims with prejudice. *See* docket no. 353. The June 4, 2002 Order explicitly stated: "This judgment is entered pursuant to Fed.R.Civ.P. 58, and is a final appealable Order." Order at 2.[17] Thereafter, no interested party filed a notice of appeal. Thus, there is no question but that the Court's June 4, 2002 Judgment Order, giving official approval to all of the terms and conditions contained in the parties' Settlement Agreement, is final.

The Final Settlement Agreement approved on May 8, 2002 was substantially more favorable to the Plaintiff Class than was the first settlement agreement the Court had preliminarily approved on August 29, 2001. The primary improvement was that the "funding value" of the Final Settlement Agreement was approximately

---

**16.** Later, on March 13, 2002, the Court granted another motion to amend, and the Court conditionally certified an amended class that also included recipients of *reprocessed* Inter–Op shells. *See* docket nos. 231 & 248.

**17.** Following the Court's Orders giving final approval to the Settlement Agreement, the parties offered several, mutually-agreed-upon amendments to the Settlement Agreement. These amendments were either minor and technical in nature, or were made for the purpose of improving the benefits given to the Plaintiff Class. *See, e.g.,* docket no. 550 (motion for Order approving a Sixth Amendment to the Settlement Agreement, primarily for the purpose of speeding up the timing of receipt of settlement funds by the plaintiffs).

The Court granted all of these motions to amend, typically noting that it had "earlier concluded that the Settlement Agreement was fair, adequate, non-collusive, and reasonable, and meets the requirements of Fed.R.Civ.P. 23(e). The proposed amendment does not materially alter the Settlement Agreement, and does not change the Court's fairness analysis, except possibly to increase the adequacy, fairness, and reasonableness of the Agreement by enhancing the overall value of the settlement to the Class." *Id.* at 1. The Court granted the last of the motions to amend the Settlement Agreement on June 11, 2003. None of the amendments affected in any way the Common Benefit provisions of the Settlement Agreement.

$1.045 billion, or about $447 million more than the first settlement agreement.[18] Other improvements included the following:

- As noted above, both Sulzer AG and the Winterthur insurers agreed to pay substantial amounts toward settlement.
- Compensation for the class increased. For example, compensation payable to a plaintiff who underwent one revision surgery increased from $37,500 in cash and $20,000 in stock to approximately $160,000, most or all of which was in cash, plus another $46,000 in cash available for payment of contingent attorney fees.
- Funding for the Extraordinary Injury Fund rose from $30 million to $100 million.
- The proposed "six-year liens" running in favor of the plaintiff class on all Sulzer Orthopedic assets were eliminated.
- A large percentage of the funds paid by Sulzer Medica came from bank loans and convertible debt instruments, rather than anticipated future earnings.
- Plaintiffs who had revision surgery could chose a "Guaranteed Payment Option," which provided, among other things, a partial payment of at least $40,000 within 45 days.

- The parties developed a defined matrix of factors delineating payment entitlements and amounts from the Extraordinary Injury Fund.

Last, the Final Settlement Agreement contained a provision that leads the Court to issue the instant Order. The Settlement Agreement stated that it was appropriate for certain attorney fees and expenses to be paid out of the settlement funds to attorneys who had "contributed to the creation of the Settlement Trust through work devoted to th[e] 'common benefit' of Class Members, including any attorney who reasonably believe[d] that he or she actually conferred benefits upon the Class Members as a whole through state court litigation, subject to determination by the Court." Settlement Agreement at § 1.1(v) (docket no. 361). The Settlement Agreement further provided that

> Common Benefit Attorneys shall be entitled to reasonable attorney fees up to a maximum of $50.0 million in the aggregate and to reimbursement of reasonable expenses up to a maximum of $7.5 million in the aggregate, to be paid out of the Sulzer Settlement Trust as approved by the Court. The Common Benefit Attorney fee payment shall be made out of the [proceeds of the] CCI [convertible callable instrument] and the Common Benefit Attorney expenses shall be paid out of the Initial Insurance Proceeds.

Settlement Agreement § 5.4.[19]

---

**18.** To be fair, the defendants would likely have paid certain amounts under the initial settlement agreement in addition to the $598 million "funding value." For example, the final settlement agreement states explicitly that the defendants will pay up to $15,000 per class member to third party payors for subrogation claims, and earmarks $60 million for these claims; in comparison, the first settlement agreement did not segregate any funds and left somewhat nebulous the treatment of subrogation interests, the intent being "that defendants would negotiate with subrogees and work out payment on their subrogation claims." Order at 47 (Aug. 31, 2001) (docket

no. 61). *Cf.* footnote 13, above. The potential for fluctuation in the value of Sulzer Medica stock, a component of the initial settlement agreement, could also have affected the total value received by the class, likely increasing the total compensation received. Thus, it is hard to compare the total monetary value of the initial and final settlement agreements "apples-to-apples." It is clear, however, that the latter value is higher.

**19.** Given the total value of the Settlement at approximately $1.045 billion, the $50 million amount set aside for Common Benefit Fee Awards was about 4.8% of the total Settle-

As noted, the question of *whether* there should be any awards of fees to Common Benefit Attorneys is now settled, as is the question of whether the total amount set aside for such awards is adequate or appropriate, because the Court's Order approving and adopting the Settlement Agreement and all the provisions therein has not been appealed. An individual attorney may still question the propriety of the amount of his fee award, however, by raising the issue with the Sixth Circuit Court of Appeals, as this issue is normally raised post-judgment, after the awards have actually been entered by the Court.

With regard to the procedure an attorney was required to follow to obtain a Common Benefit award, the Settlement Agreement further provided that any attorney seeking an award of expenses or attorney fees as a Common Benefit Attorney "shall first make an application to the Court. The Court may appoint a special master, and with the input of a committee comprised of an equal number of members from Class Counsel and the Special State Counsel Committee, will review all such applications and make a determination with respect to any such attorney's eligibility to receive payments." *Id.* at § 5.5. The Agreement provided that the Expense Awards and Fee Awards "shall be paid to liaison Class Counsel who shall distribute such amounts to Common Benefit Attorneys as approved and allocated by the Court." *Id.* at § 5.6.

Consistent with these provisions of the Settlement Agreement, the Court appointed four persons to a Common Benefit Attorney Fee Committee. *See* docket

nos. 359 & 364.[20] The Court also issued Proposed Guidelines "outlining how it will receive and examine" applications for Common Benefit Awards. *See* docket no. 367, Order at 1. After receiving suggestions and objections to the Proposed Guidelines, the Court issued Final Guidelines on how attorneys could make application for Common Benefit Awards. *See* docket nos. 378 & 576. These Guidelines were quite detailed. For example, the Guidelines: (1) required separate submission of Applications for Fees and Applications for Expenses, both of which had to be in a specific format with specific supporting documentation; (2) set out a lengthy description of work for which attorney fees would not be reimbursed at all; and (3) required submission of attorney biographies, narratives of services performed, and a sworn affidavit affirming the accuracy of all statements made. The Final Guidelines also provided that any applicant or Class Member could file objections to any individual Application for Expenses or Fees. Finally, the Final Guidelines noted that, given the timing of the applications and the availability of funds, "the Court expects it will make its ruling on the Expense Request[s] prior to its ruling on the Fee Request[s]." Guidelines at 13–14.

Following publication of the Final Guidelines, the Court received 57 applications for Common Benefit Expenses and 57 applications for Common Benefit Fees; a number of these applications were later supplemented, as well. On March 21, 2003, the Court entered an Order setting out common benefit Expense Awards totaling $3,760,583.81 (docket no. 610).[21] The

---

ment value, and the amount set aside for Common Benefit Expense Awards was about 0.7% of the total Settlement value.

**20.** The Court elected not to appoint a special master.

**21.** The Court later issued two Orders amending the original Expense Award Order (docket

nos. 611, 626). The second amended total of Common Benefit Expense Awards was $3,741,969.11. The second amended total of the Common Benefit Expenses *requested* in the applications and supplements was $3,988,032.03. The Court disallowed $246,062.92 of this amount.

Court made clear that its Order declaring Expense Awards was a final appealable Order, under Fed.R.Civ.P. 58. Subsequently, one attorney asked the Court to provide "a personal itemization of expenses he submitted but the Court disallowed," which the Court had stated it would supply upon formal request. *Id.* at 10. No attorney filed any appeal.

Having completed its analysis of the common benefit Expense Award applications, the Court now examines the common benefit Attorney Fee Applications.

*II. Fee Awards.*

*A. General Standards.*

■■■ With regard to payment of attorney fees, the "American Rule" holds that "the prevailing litigant is ordinarily not entitled to collect a reasonable attorney's fee from the loser." *Alyeska Pipeline Serv. Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). There are, however, several exceptions to this rule. *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (listing exceptions). First, a court may award attorney's fees to the prevailing party when explicitly authorized by a "fee-shifting" statute, *Alyeska,* 421 U.S. at 264 n. 37, 95 S.Ct. 1612, or when there is a fee shifting provision contained in an "enforceable contract" between the litigants, *id.* at 257, 95 S.Ct. 1612. These two exceptions are legal, not equitable, in nature. Second, a court may award attorney's fees "against a party who had acted in bad faith," *id.* at 245, 95 S.Ct. 1612, or against a party who engaged in "wilfull disobedience of a court order," *id.* at 258, 95 S.Ct. 1612. These two exceptions derive from the court's eq-

uity jurisdiction, and "the underlying rationale of 'fee shifting' [in these circumstances] is, of course, punitive." *Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973).

■■■ Finally, "[a]nother established exception involves cases in which the plaintiff's successful litigation confers 'a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.'" *Id.* (quoting *Mills v. Electric Auto–Lite,* 396 U.S. 375, 393–94, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)). This "common benefit exception" is also equitable in nature and "allows an award of fees to a plaintiff whose suit creates, enlarges, or protects a fund shared by members of a class." *Shimman v. International Union of Operating Engineers, Local 18,* 744 F.2d 1226, 1234 (1984), *cert denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). Fee shifting is justified in common benefit cases "not because of any 'bad faith' of the defendant but, rather, because '(t)o allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense.'" *Hall,* 412 U.S. at 5–6, 93 S.Ct. 1943. *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) (the common fund doctrine provides that "a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole").[22]

**22.** Technically, the common benefit exception is not "fee shifting" at all. In a common fund case, the "fees are not assessed against the unsuccessful litigant (fee shifting), but rather are taken from the fund or damage recovery (fee spreading), thereby avoiding the unjust enrichment of those who otherwise would be benefitted by the fund without sharing in the expenses incurred by the successful litigant." *Court Awarded Attorneys Fees, Report of the*

■ The Sixth Circuit Court of Appeals has made it clear that it is within the discretion of this Court "to determine the 'appropriate method for calculating attorney's fees in light of the unique characteristics of class actions in general, and of the unique circumstances of the actual cases" pending before the Court. *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 779 (6th Cir. 1996) (quoting *Rawlings v. Prudential– Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir.1993)). There are two primary (but by no means exclusive) methods to determine a common fund fee award: "the lodestar method [and] the percentage of the fund method." *Rawlings*, 9 F.3d at 515. The lodestar method involves the calculation of "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); *see In re Telectronics Pacing Systems, Inc.*, 137 F.Supp.2d 1029, 1041 (S.D.Ohio 2001) (the lodestar method "requires the class counsel to submit a listing of hours and their rates charged per hour"). This sum may then be "increased by a 'multiplier' to account for the costs and risks involved in the litigation, as well as the complexities of the case and the size of the recovery." *Telectronics*, 137 F.Supp.2d at 1041 (citing *Rawlings*, 9 F.3d at 516). In contrast, "[u]nder the percentage of the fund method, the court simply determines a percentage of the settlement to award the class counsel." *Id.*

■ Each of the two methods has its own advantages. The percentage of the fund method "is easy to calculate [and] it establishes reasonable expectations on the part of plaintiffs' attorneys as to their expected recovery." *Rawlings*, 9 F.3d at 516. The lodestar method "provides greater accountability." *Id.* Also, enhance-

ment of the lodestar with a multiplier "can serve as a means to account for the risk an attorney assumes in undertaking a case, the quality of the attorney's work product, and the public benefit achieved." *Id.* Ultimately, "[t]he lodestar method better accounts for the amount of work done, while the percentage of the fund method more accurately reflects the results achieved." *Id.* As noted above, this Court enjoys discretion as to which method it will choose. The ultimate issue is whether the Court's "award of attorneys' fees in common fund cases [is] 'reasonable under the circumstances.'" *Bowling*, 102 F.3d at 779; *Smillie v. Park Chem. Co.*, 710 F.2d 271, 275 (6th Cir.1983). The Court must ensure "that counsel is fairly compensated for the amount of work done as well as for the results achieved." *Rawlings*, 9 F.3d at 516. This means that any given attorney should receive neither too little nor too much of an award as compensation for the common benefit he conferred upon the class as a whole.

In *Bowling*, Chief Judge Boyce F. Martin, Jr. of the Sixth Circuit Court of Appeals examined the common benefit fee awards entered by the district court in connection with a case similar to this one: a medical product liability case that ended in a "worldwide class-action settlement." *Bowling*, 102 F.3d at 779. After settlement, the district court received five applications for common benefit fee awards. *See Bowling v. Pfizer, Inc.*, 922 F.Supp. 1261 (S.D.Ohio 1996), *affirmed*, 102 F.3d 777 (6th Cir.1996). The district court ultimately found that two of the applications were well-taken and awarded fees to: (1) class counsel and five special counsel, who had applied jointly in one application; and (2) a public consumer group, which had helped bring the product defect to light and had been an objector during the set-

*Third Circuit Task Force,* 108 F.R.D. 237, 250 (1985).

tlement process. The district court awarded no common benefit fee at all to the remaining three applicants. As to the awards it did enter, the district court "based its fee award on a percentage of the common fund and then cross-checked the fee against class counsel's lodestar." *Bowling*, 102 F.3d at 780. The district court's two awards totaled slightly more than 10% of the settlement fund. The district court also followed the dictates of *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir.1974), *cert. denied*, 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975), and examined the reasonableness of its calculations by assessing the fee awards in light of six factors: "(1) the value of the benefit rendered to the 'plaintiff class …; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides." *Bowling*, 102 F.3d at 780. The *Bowling* Court of Appeals affirmed the district court's Order in its entirety, finding that the district court's analysis was "thoroughly reasoned." *Id.*

Interestingly, one of the *disadvantages* of using the lodestar method is that it can be "too time-consuming of scarce judicial resources." *Rawlings*, 9 F.3d at 516; *see Telectronics*, 137 F.Supp.2d at 1041–42 (noting that the a court can easily "becom[e] entangled in a time-consuming process of toiling over time sheets"). Thus, an argument can be made that a court should not use *both* the lodestar method and the percentage of the fund method to derive appropriate common benefit fee awards, as did the *Bowling* district court; although the results may be more accurate and better-reasoned, the effort involved can be prodigious. On the other hand, many courts choose to engage in this "cross-checking" analysis because "the district court has a duty to individual class members to ensure that the requested fee is reasonable, [and] that it does not engender a second major litigation." *Fournier v. PFS Investments, Inc.*, 997 F.Supp. 828, 831 (E.D.Mich.1998) (using both analyses, and citing *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)); *see Telectronics*, 137 F.Supp.2d at 1042, 1045–46 (primarily using the lodestar method, but conducting informal cross-checks using the percentage of the fund method).

In this case, the Court has followed the approach of the *Bowling* and *Fournier* courts and used both methods, using each method to cross-check the other and ensure that each attorney who is awarded a common benefit fee receives a reasonable one—neither too large nor too small—in light of all the relevant circumstances. This double-pronged approach also helped the Court to enter fee awards that reflect accurately the common benefit each applicant conferred upon the plaintiff class *relative to each other applicant*—a very difficult task, given the large number of applicants. *Cf. In re Prudential Ins. Co. of America Sales Practices Litigation*, 148 F.3d 283, 329 n. 96 (3rd Cir.1998), *cert. denied*, 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999) (given a stipulation amongst 25 law firms regarding attorneys fees in a class action settlement, the court did not have to "undertake the difficult task of assessing counsels' relative contributions"). By using both the lodestar method and the percentage of the fund method, the Court has ensured its fee awards are reasonable and appropriate both individually and in toto.

### B. Case–Specific Standards.

Before applying the six factors set out in *Ramey* that this Court must assess when

entering fee awards, the Court lists certain standards it employed specifically in this case. The Court used these standards primarily within the context of the lodestar method of its two-pronged analysis, but also considered these standards in the context of the percentage-of-the-case method: "The same factors used to calculate lodestar multipliers determine what is an appropriate percentage to award." *Weil v. Long Island Sav. Bank, FSB,* 188 F.Supp.2d 265, 268 (E.D.N.Y.2002) (citing *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 47 (2nd Cir.2000)); *see Brown v. Phillips Petroleum Co.,* 838 F.2d 451, 454–55 (10th Cir.1988), *cert. denied,* 488 U.S. 822, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) ("[b]ecause [the lodestar] factors measure the attorneys' contributions, they are also appropriate in setting and reviewing percentage fee awards in common fund cases").

As noted above, following publication of the Final Guidelines regarding counsel's requests for common benefit awards in this case, the Court received 57 applications for Common Benefit Fees. The Court received one objection to all of these applications.[23]

The Court has spent a significant amount of time reviewing in detail the applications and supplements, the supporting documentation, the advice of the Common Benefit Attorney Fee Committee,[24] and the objection and responses thereto. These materials fill about seven banker's boxes. In several instances, the Fee Committee corresponded with counsel, asking for an explanation of a claimed expense or fee. In a few instances, the Court wrote its own letters to the applicants, asking for clarification or explanation of the requests, or expressing concern about apparent violations of the Court's Guidelines. With the help of the Common Benefit Attorney Fee Committee, the Court examined virtually every entry listed in every Fee Application. The Court then applied the following six categories of guidelines to determine whether a given attorney fee was properly reimbursable. The first three categories are the ones that most often required the Court to reduce its calculation of a given attorney's common benefit Fee Award.

First, and primarily, a given attorney fee was reimbursable only if it actually advanced the interests of the *entire* Plaintiff Class. Fees that were charged for counsel's efforts taken primarily for the benefit of a given individual plaintiff, or even a smaller group of plaintiffs, and not the entire class of plaintiffs as a whole, did not qualify for reimbursement, as they did not provide a true "Common Benefit."[25] Although it could be argued that the activity associated with a certain fee did provide *some* benefit to the entire class, the Court disallowed that fee if the asserted beneficial connection to the entire Plaintiff Class was tenuous, or if the associated activity may be fairly said to benefit an individual

---

23. Specifically, an objection filed on behalf of 17 class members (the "Agretelis Plaintiffs") challenged about 40 of the 57 Fee Applications. *See* docket nos. 521, 543, & 561. The Court examines this objection below, in section II.C of this Order.

24. As described in the Final Guidelines, the Common Benefit Attorney Fee Committee reviewed the applications "for accuracy and advise[d] the Court with respect to the involvement of the Applicants in the prosecution of the federal and state cases, including common benefit discovery, organizational and coordination efforts, and settlement negotiations." Guidelines at 14. The Committee "[did] not provide advice regarding specific amounts to be awarded to individual attorney fee applicants." *Id.*

25. With regard to the reimbursability of attorney fees incurred in connection with assisting otherwise unrepresented class members to fill out claims forms, see Claims Administration Procedure 14, ¶ 5.

plaintiff or group of plaintiffs more than the *entire* Plaintiff Class.[26]

■ Second, fees charged by an attorney merely to attend a meeting or conference related to the Multi–District Litigation, when the attorney's presence was not reasonably necessary, were not reimbursable. Examples of attorney fees disallowed under this rule include: (1) fees related to attendance at the initial MDL Panel hearing in Washington, D.C., unless the attorney actually presented argument in relation to the Motion to Consolidate the Sulzer cases; (2) fees related to attendance at conferences sponsored by ATLA, Mealey's, or similar groups, unless the attorney was authorized to make a presentation to the group by MDL lead counsel or the Special State Counsel Committee; (3) fees related to attendance at depositions by more than one attorney per law firm, unless the law firm actually conducted the deposition; (4) fees related to attendance at any meeting that was related primarily to an individual case, and not the MDL; and (5) fees related to attendance at any MDL conference or hearing, unless the attorney: (a) was Class Counsel, Special Counsel, a member of the Plaintiffs' Steering Committee, or a member of the Special State Counsel Committee, or (b) actually engaged in material, substantive participation at the conference or hearing.[27]

■ Third, the Court disallowed fees to the extent that: (1) "the amount of 'review' time [was] excessive as a whole when judged in reference to the role which the Attorney, or other timekeeper, had in the litigation," Guidelines at 7; (2) the amount of time listed was "grossly excessive on its face, when considered as a whole in light of the role which the Attorney, or other timekeeper, had in the litigation," *id.;* and (3) the amount of time it took for a given task was more than was reasonable or necessary.

To summarize simply the first three guideline categories: the Court did not allow reimbursement for fees associated with an attorney's time unless it truly appeared well-spent, to the benefit of the entire class. Notably, with regard to some attorneys, application of these guidelines did not reduce the lodestar calculation at all; with other attorneys, these guidelines reduced the lodestar calculation dramatically. Indeed, as to some timekeepers, the Court concluded that *none* of their hours listed were properly reimbursable. For one reason or another, the Court reduced the "hours worked" factor in its lodestar calculation for about half of the applicants. Ultimately, however, the Court found that

26. As stated in the Final Guidelines: "Only fees and costs associated with MDL or state discovery that were authorized by Class Counsel, the leadership of the California Consolidated Proceedings, or the leadership of the Texas Consolidated Proceedings will be considered." Guidelines at 5. One reason the Court deemed this restriction reasonable was that counsel's efforts made on behalf of individual class members were compensated through the payment of contingent fees tied to the value of the amounts paid to the individual claimants out of the settlement trust.

27. In fact, even if an attorney was Class Counsel, Special counsel, a member of the Plaintiffs' Steering Committee, or a member of the Special State Counsel Committee, fees associated with attendance at the Final Fairness Hearing, in particular, were not reimbursable unless the attorney also actually engaged in material, substantive participation; the Court did not allow reimbursement for fees only so an attorney could appear at the hearing in person. Although an attorney's attendance at such hearings was certainly not unreasonable, it cannot be said that the fees associated with mere attendance truly produced a Common Benefit, unless the attorney actively participated at the hearing.

only about 5.9% of the 53,671 total time-keeper hours listed by all timekeepers was not spent on reimbursable, common benefit activity.[28]

■ Similarly, just as the Court did not allow reimbursement of fees for certain *hours* listed by several applicants, the Court also did not allow reimbursement of fees at certain *rates* listed by several applicants. Because the hourly rates submitted by attorneys of the same experience varied substantially, the Court "equalized" the attorneys' lodestar calculations by substituting the following hourly rates, depending on years of practice: 1–5 years, $200/hour; 6–9 years, $300/hour; 10–14 years, $400/hour; and 15 years and over, $500/hour.[29] This recalculation worked to reduce the hourly rate of about 1/6 of the attorneys who applied for common benefit fees.

■ Fourth, fees were not reimbursable if the attorney did not document them properly. Among other things, the Final Guidelines required attorneys to submit daily, monthly, and total time sheet summaries that: (1) followed a particular format, including organization by timekeeper and listing of cumulative totals; (2) included hourly rates and description of professional status (e.g., partner, paralegal, and so on); and (3) described in sufficient detail the nature and purpose of the legal service provided.

Fifth, the Court examined the amount of fees each attorney expects to receive in connection with this litigation from other sources. Specifically, the Court examined: (1) arrangements under which an attorney expects to pay to, or receive from, other persons any portion of any Common Benefit Fee Award; and (2) the net amount of contingent fees the attorney or his law firm will receive pursuant to their own contracts with class members. With regard to this latter issue, the Settlement Agreement states explicitly, in Section 5.5, that "the Court shall consider, among other factors, any contingent fee paid to a Common Benefit Attorney pursuant to Section 5.1 and Section 5.2 when making an award of a fee."[30] As the Court explained in the Final Guidelines:

> When the Court approved the Settlement Agreement in this case, which included payment of a substantial portion of those contingency fees owed by represented claimants to their individual counsel, the Court took into consideration the fact that counsel's efforts on behalf of these individual claimants also conferred a measurable benefit upon the class as a whole. Having taken the unusual step of authorizing the payment of contingency fees out of settlement proceeds—thereby spreading the cost of those contingency fees across the entire class, including unrepresented claimants—the Court concludes it is inappropriate to also award out of common benefit funds any item of time or expense incurred in connection with the trial of

---

28. These statistics, as well as all the other statistics set out below regarding the Court's common benefit fee awards, *include* the Court's calculations in connection with those attorneys who, though they have otherwise earned fee awards, currently have had their awards withheld. To the extent the Court's actual, eventual common benefit fee awards to these attorneys is different from the Court's current estimates of the awards these attorneys could receive, the Court's statistics may be very slightly imprecise.

29. The Court only substituted these hourly rates, which are higher than the Court normally allows in lodestar calculations, if the rates listed in the application were *higher*.

30. As stated in the Final Guidelines, applicants had to provide this information in a specific format called a "Contingent Fee Report," which included an explanation of contingent fee amounts that the attorney and his firm "reduced or waived" for Class Members or opt-outs. Guidelines at 11.

individual cases or groups of cases, or the case-specific preparation of those cases for trial.

Guidelines at 6–7 n. 1. In other words, the partial payment by the Settlement Trust of contingent fees owed by certain class members to their attorneys is not only a benefit to those class members, it is also a monetary recognition that the attorneys' general litigation efforts, and/or advice to their clients to participate in the settlement agreement, provided a common benefit to the entire class. Thus, an attorney's receipt of contingent fee payments out of the settlement trust, rather than out of an award to his individual client, must be a factor in the assessment of that attorney's common benefit fee award.

And sixth, the Court was careful to state in its Final Guidelines that "[a]ny intentional violation of these Guidelines is grounds for the Court to deny a request for payment of counsel fees or reimbursement of litigation expenses in whole or in part, as well as for such other sanctions and penalties as may be appropriate under the law." Guidelines at 13. Indeed, attorneys were required to submit sworn affidavits affirming the accuracy of the information contained in their applications. As a general rule, attorneys who applied for Common Benefit Awards were "careful to comply with the Final Guidelines and did not request reimbursement for [fees] that the Guidelines clearly disallowed. This was especially true of those attorneys who did the most Common Benefit work." Expense Award Order at 9 n. 15 (docket no. 610). Unfortunately, there were also attorneys who submitted Fee Applications containing incorrect information that went beyond being less-than-careful; a very small minority of Fee Applications contained material misstatements that could

not have been accidental. The Court has reduced its award of common benefit fees to attorneys who engaged in what the Court can characterize only as reckless or intentional violations of its Guidelines.[31]

In addition to the six categories discussed above, the Court also examined a critical, seventh factor regarding the propriety of awarding a common benefit fee. The Court has been forced to take notice that several attorneys who submitted applications for Common Benefit Attorney Fee Awards have, in fact, taken action subsequent to finalization of the Settlement Agreement that is *detrimental* to the common benefit of the class. At the Final Fairness Hearing, the Court had to determine whether the Final Settlement Agreement was fair, adequate, and reasonable. One of the critical factors in making this assessment was whether the then-conditionally certified class included *all* persons who might have been injured by a defective Sulzer product. In other words, the Court wanted to be absolutely sure that the Final Settlement Agreement: (1) did not "leave out" any person who should receive compensation; and, at the same time (2) resolved (or, at a minimum, clearly defined) for the defendants all disputes arising out of the recalls that were the subject of the settlement. This concern was also shared by counsel for all parties: counsel for plaintiffs wanted to ensure the class was defined with sufficient breadth because counsel wanted no deserving person left uncompensated; counsel for defendants also wanted to make sure the class was defined with sufficient breadth because counsel wanted to achieve a truly global resolution, and not face additional litigation after settlement (other than opt-

---

**31.** The Court was very tempted to reduce the Fee Awards in these circumstances to zero, but ultimately decided against it. The Court's Fee Award reductions serve as sufficient and appropriate sanction.

out litigation), based on essentially the same set of facts.

Thus, there was substantial testimony at the Final Fairness Hearing to the effect that: (1) the hip and knee implant recalls, and thus the definition of the class in this case, were probably *over-inclusive*, "to err on the side of patient safety;" and (2) the timetables imposed by the claim deadlines were generous, ensuring that 99.9% or more of the class population needing revision surgery would obtain it before the deadline. *See* Final Fairness Hearing tr. at 278 (Joseph Poirkowski); *id.* at 149–58 (Victor Goldberg). The scientific and statistical evidence also showed the extremely high likelihood that any person who required revision surgery connected with a Sulzer implant, but who was *not* a member of the defined plaintiff class, was excluded because their need for revision surgery had *no connection* with the product defect at issue in this case.[32] Furthermore, there was testimony from a number of Fee Award applicants averring strongly that the Final Settlement Agreement—including the class and sub-class definitions—was fair, adequate, and reasonable.

Nearly all of the clients of the Fee Award applicants then participated in the Settlement. That is, these clients followed counsel's advice, chose not to opt out, and submitted claims forms to the Claims Administrator. It turned out, however, that a number of these clients were not class members after all, because they had not been implanted with an affected product; accordingly, they did not submit claims forms, or they did, but their claims were denied. Despite this, some of the Fee Award applicants continued to pursue compensation from Sulzer on behalf of these clients by bringing suit in an alternative forum. Essentially, these attorneys:

(1) originally claimed that their clients were harmed because they received one of the defective Sulzer implants that were a part of the recalls; (2) learned that, in fact, their clients did not receive such a product; and (3) decided to seek compensation from Sulzer anyway. Notably, the allegations in many of the complaints in these cases did not change and were premised on the *same* product recalls and the *same* facts and circumstances.

The pursuit of litigation against the Sulzer defendants on behalf of plaintiffs not included in this class action, *under the same theory of liability as in this class action*, is simply inappropriate. Counsel cannot, on the one hand, represent to the Court that the Settlement Agreement fairly and adequately *includes* in the plaintiff class all persons injured by the defective products, and, on the other hand, represent non-class-members in separate lawsuits against the same defendants on the same theory of liability; the two representations cannot be made at the same time in good faith. In essence, counsel must argue, with these latter lawsuits, that: (1) the defendants did not, after all, pay the *maximum* amount to settle the class action; and (2) the defendants did not, after all, pay compensation to *all* persons who were harmed by the defective products. In other words, counsel must now argue that, contrary to their earlier representations to the Court, they did not maximize the common benefit in this class action. Indeed, these dichotomous positions go beyond being a misrepresentation to the court; they create substantial conflicts of interest. From the beginning, the primary interest of class members was to maximize their compensation from Sulzer, through imposition of the highest possible

---

**32.** For various reasons, between 0.5 and 1.5 percent of patients who receive a hip implant will need revision surgery even if the implant is perfectly fine and suffers no defect. Final Fairness Hearing tr. at 276.

monetary settlement payable to the class. Any non-class member who sued Sulzer necessarily sought compensation that would *not* be available to the class, an interest in direct conflict with that of the class members. It is even true, moreover, that, by pursuing litigation against Sulzer on behalf of non-class members, these attorneys have and are continuing to put at risk Sulzer's ability to make all promised payments to the class—many of which payments, as noted above, have not yet been made, either because they are not yet due or because certain contingencies on which they are premised have not yet occurred.

The simultaneous representation of both types of plaintiffs by counsel is, at the least, highly problematic. It means that counsel, knowing they were omitting certain of their clients from receiving class benefits, argued to this Court that the class was fully inclusive, and are now essentially arguing that the class was under-inclusive. It also means that counsel argued to this Court that the compensation to class members was fair, and are now arguing that other clients, purportedly injured in the same way, should be entitled to payment upon terms potentially more favorable than those afforded to class members.

This seventh factor has a *substantial* impact on the Court's final analysis of whether the totality of an applicant's efforts actually inured to the common benefit of the entire plaintiff class. Accordingly, the Court concludes that it must, at this juncture, withhold any award of common benefit fees to attorneys who are engaged in activity that is inconsistent with the long-term benefit of the class. Before entering common benefit fee awards to these attorneys, the Court must determine the extent to which the conflicts discussed above exist for each individual applicant, including whether each applicant is relying on an alleged product defect that is the same as the defect alleged in the MDL.[33] Only after these applicants have each, individually, explained in detail to the Court their theories of liability in the non-MDL cases they are pursuing against the Sulzer entities, and how those theories of liability differ from the theories advanced in the MDL, can the Court complete its analysis of each applicant's appropriate common benefit fee award.[34]

The discussion above lists most, but not all, of the factors the Court assessed during its analysis for each common benefit fee applicant. It is worth noting that the Court's calculus of the appropriate common benefit Fee Award for each attorney was more difficult in this case than in the average case, for a number of reasons. First, the calculus included both linear factors and non-linear factors. An example of a linear factor is the fairly straightforward determination of whether a particular timekeeper's hourly billing rate was

---

**33.** This latter point is particularly meaningful because it will allow the Court to determine whether any of these counsel made representations to the Court through participation in (or failure to object at) the Final Fairness Hearing, which representations they then believed were not true, or which they intended to later contend, in some other forum, were not true.

**34.** The applicants who applied for and are otherwise eligible to receive a common benefit fee award, but from whom the Court has withheld a fee award at this juncture based on the "seventh factor" discussed above, are shown on the attached chart as having a fee award "Withheld." **THESE APPLICANTS MUST FILE WITH THE COURT A FORMAL EXPLANATION, WITHIN 14 DAYS OF THE DATE OF THIS ORDER**, addressing as fully as possible the concerns the Court has raised here. Conclusory statements that the theories of liability in their current product defect cases against Sulzer are different than the MDL theories will not be sufficient.

excessive. An example of a non-linear factor is the degree to which an attorney's receipt of a given amount of *contingent* attorney fees should affect that attorney's receipt of *common benefit* attorney fees. Second, especially in connection with the determination of an appropriate multiplier, the Court had to engage in a very difficult assessment regarding the amount *and quality* of each attorney's effort, and had to undertake that assessment *relative to the many other attorneys* involved in common benefit efforts. This assessment was difficult in its own right, and made the entire exercise of determining fee awards more arduous because it forced the Court to check and recheck all of the other factors that it weighed for each attorney.[35]

## C. The Six Ramey Factors and the Objection to the Fee Awards.

Following submission by the Common Benefit Attorney Fee Committee of a memorandum in support of fee awards, a group of 17 class members ("the Agretelis Plaintiffs") filed a response, objecting that the total of the common benefit fee awards should be no more than $10 million. *See* docket nos. 542 & 561. This objection included three principal arguments: (1) much of class counsel's work was actually detrimental to the class, and did not provide a common benefit at all; (2) many common benefit fee applicants are already receiving contingent fee payments from their clients, part of which are paid by the Settlement Trust, and this is sufficient compensation; and (3) because liability was "admitted" and the life of the case was relatively short, the applicants did not do enough work to earn a total of $50 million in common benefit fees. The Agretelis

Plaintiffs urge that "no more than $10 million be awarded in common benefit fees and that [the remaining] $40 million be transferred to the [Extraordinary Injury Fund] to be distributed to severely injured class members." Objection at 1.

■■■ The Court assesses the arguments made by the Agretelis Plaintiffs in the context of examining the six *Ramey* factors that it "must consider in assessing a reasonable award from a common fund." *Telectronics*, 137 F.Supp.2d at 1042 (citing *Ramey*, 508 F.2d at 1196). To repeat, these factors are: "(a) the value of the benefits rendered to the class; (b) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (c) whether the services were undertaken on a contingent fee basis; (d) the value of the services on an hourly basis; (e) the complexity of the litigation; and (f) the professional skill and standing of all counsel." *Id.* " Most important among these factors are the value of the benefit rendered to the plaintiff class and the value of Counsel's services on an hourly basis." *Bowling*, 922 F.Supp. at 1280 (citing *Rawlings*, 9 F.3d at 516).

### 1. The Value of the Benefits Rendered to the Class.

It is certainly no coincidence that, at the time of the Final Fairness Hearing, there were pending only seven objections from a class of defective product recipients numbering over 30,000. This unusual and happy circumstance may be attributed to the widespread belief by class members, their counsel, and the public that the $1.045 billion Final Settlement Agreement provided benefits to the class of tremendous

---

**35.** The Court designed its Final Guidelines with this second difficulty in mind, stating: "Given the limited amount of funds available for payment of common benefit fees and expenses, the Court must examine each Applicant's common benefit efforts relative to each

other Applicant. Accordingly, the Applicant shall not provide a 'total fee request' or otherwise suggest a specific amount of fees to be awarded to the Applicant or his Firm." Guidelines at 11.

value.[36] As a part of their initial settlement agreement, the parties had arranged for "an extremely thorough viewing of the defendants' financial circumstances" to ensure that the defendants would, ultimately, "'suffer[]' the maximum judgment they can withstand." Order at 39 (docket no. 61). By the time of the Final Fairness Hearing, counsel for plaintiffs (both within and without the MDL) were virtually unanimous that, in fact, the defendants were paying as much as they could to the plaintiff class to resolve the litigation. Indeed the Court concluded that "the sizeable and detailed record compiled by the parties *compels* the conclusion that this settlement represents an eminently fair and reasonable resolution for the entire Plaintiff Class." Order at 3 (docket no. 340) (emphasis in original).

Not only is the *amount* of recovery of great value to the class, it is fair to say that the most significant benefit to the class is *any* "settlement· of this litigation for a reasonable amount," especially given the advanced average age of the class. *Telectronics*, 137 F.Supp.2d at 1042. At times, this Court acted as a mediator during the parties' negotiations, so the Court has personal knowledge of how close one or more of the Sulzer defendants came to declaring bankruptcy—very. Other medical device companies in the same circumstances have been forced into bankruptcy, thereby causing great delay in recovery of *any* money at all to *any* plaintiff. *See, e.g., In re Dow Corning Corp.*, 86 F.3d 482, 485–86 (6th Cir.1996) ("due to the litigation burden imposed by what is one of the

world's largest mass tort litigations, and the threatened consequences of the thousands of product liability claims arising from its manufacture and sale of silicone breast implants and silicone gel, Dow Corning filed a petition for reorganization," despite having earlier "contemplated the creation of a $4.25 billion [settlement] fund").[37]

In this case, "time [was] of the essence, and protracted litigation create[d] a risk that many class members [would] not see the fruits of any judgment in their lifetimes." *Telectronics*, 137 F.Supp.2d at 1042. By crafting a global settlement with the defendants, rather than forcing them into bankruptcy, plaintiffs' counsel has insured immediate and maximum redress to individuals who faced the unattractive but highly likely alternative that their estate would receive less compensation from a bankrupt company long after their own deaths. As of today, class members and their attorneys have *received* well over $650 million in cash payments.

Beyond the quick receipt by plaintiffs of substantial amounts of cash payments, the Settlement Agreement provides other significant values to the class. These include establishment of a fund to pay for ongoing medical monitoring and research to keep track of the medical condition of class members, as well as payment of subrogation claims, unreimbursed medical expenses, and a portion of contingent attorney fees. The class as a whole also enjoys the value of having their claims treated fairly relative to one another, by virtue of the Extraordinary Injury Fund. And it is

36. As noted, this $1.045 billion amount was a *minimum guaranteed* settlement value. In addition to this amount, the settlement agreement also required Sulzer to: (1) pay certain specified categories of expense; and (2) pay additional sums upon the occurrence of certain contingencies, several of which have come to pass. Thus, the total value of the settlement—and the amount of funds received

by the Settlement Trust—will actually be substantially in excess of $1.045 billion.

37. To date, no class member in the Silicone Gel Breast Implants Products Liability Litigation (MDL 926), which has been pending for over a decade, has received any monetary recovery.

worth noting that the class, together with society as a whole, enjoys the value of having allowed a leading medical products company to continue to do business. The value of keeping Sulzer Orthopedics a going concern has presented itself in three ways: (1) the company continues to provide desirable medical products to the consuming public; (2) the company continues to provide jobs to many skilled employees; and (3) the worth of the public stock owned by shareholders around the world has been preserved and even enhanced.

The Agretelis Plaintiffs assert that the value of the benefits rendered to the class by the attorneys who have applied for Fee Awards is actually low, because these attorneys initially tried to settle the case for far less than the ultimate resolution. The Agretelis Plaintiffs assert that plaintiffs' counsel's initial negotiations were "substandard" and led to a settlement agreement designed to protect the *defendants;* as such, the Court

> should not reward class counsel's efforts to force an inadequate settlement upon injured class' members. Accordingly, class attorneys should not receive compensation for work performed before October 29, 2001 to create and implement the [initial] Proposed Settlement. Nor should class counsel receive a fee multiplier for any time in this case. If anything, class counsel's lodestar fee for work performed after November 2001 should be reduced because of the harm

the [initial] Proposed Settlement attempted to inflict on injured class members.

Objection at 4 (docket no. 561).

This objection, however, misconstrues both the nature of any initial class action settlement generally, and the work that the attorneys did in this case in particular. As the Court noted when it conditionally approved the initial proposed settlement agreement, the Court, "at [that] juncture, [was] not obligated to, nor could it reasonably, undertake a full and complete fairness review." Order at 33 (docket no. 61). Rather, the Court's duty was "to conduct a threshold examination of the overall fairness and adequacy of the settlement in light of the likely outcome and the cost of continued litigation." *Id.* The Court could, however—and did—"require further discovery to justify the settlement or to secure information needed to implement it." *Id.* (quoting *Manual for Complex Litigation,* § 30.42, at 238 (3rd ed.1995)). That is, plaintiffs' class counsel and the Court understood that the initial proposed settlement agreement: (1) was fair *as a starting point;* but (2) still needed to be proved by the fire of discovery. The initial settlement agreement was *designed* with the understanding that plaintiffs' counsel would scrutinize the defendants' finances and then re-negotiate to ensure that the defendants contributed to the settlement "substantially all of their available and reachable assets." *Id.* at 39.[38]

---

**38.** Indeed, on October 19, 2001, when the Court approved an amended proposed settlement agreement that included claimants who had received Natural Knee implants, the Court stated:

> The Court adds here its observations about the status of Sulzer AG in the context of the fairness of the settlement agreement. It is worth noting that the question of whether and to what extent defendant Sulzer AG will contribute funds to the settlement of this case is not settled. To the

contrary, the parties have made clear that this question is central and remains hotly disputed. Plaintiffs' class counsel, in particular, have made it clear that they intend to continue vigorous discovery directed at *the question of Sulzer AG's liability in this* case.

> The Court reiterates here that the extent of Sulzer AG's participation in this settlement by way of providing compensation to the class is one of the factors this Court will examine most closely, at the final fairness

It is true, moreover, that the initial settlement agreement: (1) brought the parties to the table, including those who had not even been served in any state court litigation and over whom the state courts likely could not have exercised jurisdiction; (2) halted the depletion of Sulzer's "wasting" insurance policies; (3) created a mechanism for discovery, which was both broader and more rapid than would have been available in the absence of the settlement agreement; (4) allowed for a speedy and objective development of relevant scientific questions; (5) resulted in the quick and early identification of affected class members; and (6) served as the impetus for cooperation between federal and state plaintiffs' counsel. And, while the Agretelis Plaintiffs would like this Court to wholly discount the initial settlement, it was and remains clear to this Court that it was Sulzer's willingness in that initial settlement to pledge essentially all of its disposable assets to the benefit of the class (a significant concession obtained by class counsel) that ultimately convinced counsel from around the country to pursue settlement in lieu of continued litigation.

Using the initial settlement agreement as a springboard, plaintiffs' counsel undertook an enormous effort toward discovery and negotiation before reaching the substantially improved terms contained in the final settlement agreement. With regard to document production alone, plaintiffs' counsel discovered (and then reviewed, catalogued, and managed) over 300,000 pages, many of which had to be translated from German. In addition to the circumstances surrounding the product recalls, these documents related to corporate structure, finances, insurance, veil-piercing, and other relevant issues. In order to manage, catalog, review, summarize, store, and disseminate these documents, Plaintiffs' Liaison Counsel created a Records Repository in Cleveland, Ohio. The Records Repository was responsible for installation of multiple computer terminals, provision of network access to electronic document management software, staffing and training document coders from various plaintiffs' firms from around the country, and document imaging and dissemination. The Plaintiffs' Steering Committee coordinated with state court attorneys to share deposition testimony that had previously occurred in state court cases, and coordinated the depositions of remaining key personnel of the various defendants. The combined efforts of the Special State Counsel Committee and MDL attorneys produced approximately 40 depositions of company employees, executives, and board members, which were held in the United States, Canada and Austria. Plaintiffs' counsel also undertook a comprehensive analysis of medical and

---

hearing. After discovery has concluded, the Court expects to be presented with one of three scenarios: (1) there is extremely strong proof that Sulzer AG cannot be held liable in this case; (2) Sulzer AG has provided substantial compensation in exchange for being released from claims brought by the class; or (3) Sulzer AG is not a part of the settlement and is not released.

The Court's preliminary conclusion that [this proposed] Settlement Agreement is fair rests in large part on the knowledge that the parties are working very hard toward more fully resolving the liability of Sulzer AG.

Order at 28 (docket no. 128).

Significantly, at the time of the Final Fairness Hearing, the Court actually was presented with *both* scenarios (1) and (2) above. The evidence showed that plaintiffs' counsel would have to overcome substantial obstacles to compel Sulzer AG to pay any meaningful amount to class members through the litigation process; nonetheless, Sulzer AG provided a substantial contribution of money and stock to the settlement, ultimately worth a total of about $105 million to the plaintiff class.

scientific literature, consulting with experts in many areas, including orthopedic surgery, biostatistics, and epidemiology.

The parties called upon the undersigned frequently during this seven-month interim to help resolve discovery disputes and negotiation impasses, so the Court has a detailed and specific understanding of both the work involved and the individuals who did that work. It is simply wrong to characterize generally the efforts of class counsel or the other Fee Award applicants as "substandard," or as having caused harm to the class, based on the fact that the terms of the initial settlement agreement did not benefit the class as much as the final settlement agreement. To the contrary, the terms of the initial settlement agreement satisfied this Court's threshold examination as to overall fairness and adequacy, and the significant improvement of those terms to the plaintiff class thereafter is attributable to the valuable efforts of those Fee Award applicants who produced a common benefit.[39]

The Agretelis Plaintiffs suggest that it was not the efforts of class counsel and the other Fee Award applicants that led to the improvement of the final Settlement Agreement; rather, it was the efforts of the attorneys litigating their cases in state court: "In addition to doing the lion's share of the document and deposition discovery, state court attorneys took on the arduous task of dismantling the Proposed Settlement after it had received preliminary approval." Objection at 4. This assertion is simply a mis-statement of what occurred, except that many state court attorneys *did* work to "dismantle" the proposed settlement. These dismantling efforts, however, were clearly *not* for the purpose of improving the settlement to the entire class; rather, many state court attorneys worked urgently to obtain verdicts for their *own* individual clients, and had absolutely no concern that doing so might scuttle the settlement, send Sulzer Orthopedics into bankruptcy, and prevent every other class member from receiving any meaningful benefits at all. Because these individual efforts by state court counsel were "frustrat[ing] the proceedings in this case and disrupt[ing] the orderly resolution of the MDL litigation," the Court was finally forced to enjoin all related state court litigation. Order at 7 (docket no. 72).[40] To suggest that it was the efforts of those attorneys pursuing their own cases in state court who improved the final set-

---

**39.** The Agretelis Plaintiffs also suggest that the total effort of plaintiffs' counsel was actually not very impressive: "No dispositive motions were filed and there were no disputes over experts or class certification. The case settled after about one year and class counsel's primary common benefit work was negotiation, not litigation. Negotiating a settlement over a five-month period (November 2001 through March 2002) should not merit a $50 million fee award or a fee multiplier." Objection at 5–6. To the contrary, this Court set an aggressive time-table for counsel to finish their discovery and prepare for a final fairness hearing. Counsel met this formidable goal. The aggressive and streamlined nature of this schedule was premised, moreover, on the Court's firm belief that protracted litigation would have depleted all available insurance proceeds, forced one or more of the

Sulzer entities into bankruptcy, hardened the jurisdictional and other defenses of the remaining Sulzer entities, and ultimately resulted in less, if any, compensation to most class members. Thus, that the final resolution of this litigation occurred more quickly than has occurred in other mass tort cases militates *for* meaningful Fee Awards, not against them.

**40.** For this reason, the Court finds not well-taken the Agretelis Plaintiffs' suggestion that the common benefit fee award applicants should not be compensated, in particular, for work spent on obtaining and protecting a stay of state court litigation, or for litigating the removal of certain state court actions, based on the Anti–Injunction Act and the All–Writs Act. Both of these categories of work clearly inured to the common benefit of the class, by foiling pointed efforts to derail the settlement.

tlement terms, and not class counsel and the other plaintiffs' counsel working with them, is to proffer a fiction.[41]

Moreover, the factual predicate for the Agretelis Plaintiffs' objection that some or all of the Fee Award applicants did not render a significant common benefit to the class, because they initially agreed to settlement terms that were later made *better*, appears to be incorrect. It is true that the Final Settlement Agreement was better than the initial settlement agreement in many ways, including primarily the increased amount of guaranteed cash payments and the earlier timing of payment to class members. But it is notable that, given the amount of Sulzer Medica stock that the defendants were going to put into the Settlement Trust under the first settlement agreement, and given the subsequent, substantial increase in the value of that stock, the actual value of the initial settlement today might be *higher* than the $1.045 billion value of the Final Settlement Agreement. Finally, the Court must note that, even ignoring their incorrect factual predicate, the Agretelis Plaintiffs' position is ultimately illogical—it implies the appli-

cants' efforts would have *more* value if the terms of the final settlement agreement had *not* improved.

Put simply, this Court has personal knowledge of what the Fee Award applicants actually did, how this litigation actually evolved, and the degree to which each applicant rendered benefits of value to the class as a whole. In sum, the primary *Ramey* factor supports strongly the Court's Fee Awards, both individually and as a whole.[42]

## B. Society's Stake in Rewarding Attorneys.

The Fee Award applicants in this case, as a whole, expended significant resources of both time and money to reach their final resolution. Counsel conducted extensive discovery, which included reviewing hundreds of thousands of pages of documents and deposing about 40 persons in North America and Europe. Counsel also consulted with experts and did research to become knowledgeable in many factual and legal areas, including orthopedic surgery, biostatistics, epidemiology, bankruptcy, se-

---

41. It is, of course, always true that the threat of substantial litigation in multiple fora increases the pressure on a defendant to pay additional sums to effectuate a global settlement. The parties took this reality into consideration, however, when crafting the *initial* settlement agreement; the continuing pressure on the defendants wrought by the individual efforts of state court attorneys thereafter did not, by itself, improve the settlement meaningfully. As noted above, the settlement agreement includes certain "contingent fee" payments to counsel for individual class members as compensation for and in recognition that, *to some extent*, pursuit of individual cases did help bring about and enhance the value of the settlement. While the Court continues to believe those payments were appropriate in the circumstances, the reality that prompted them in no way diminishes the critically important contributions of the Fee Award applicants. It was these applicants who brought the parties together, obtained

contributions from Sulzer AG and Winterthur, put structure on the settlement process, resolved the concerns of virtually all would-be objectors, and convinced the overwhelming majority of class members to participate in the settlement.

42. The Court notes that it has awarded a large percentage of the total of the common benefit fees awards to a relatively small number of attorneys, including those on the Common Benefit Attorney Fee Committee. This should not be surprising, because the members of the Fee Committee must necessarily be persons who "played a significant role in the litigation such that they understand not only its complexities but also the different contributions of the various counsel." *In re Diet Drugs Products Liability Litigation*, MDL No. 1203, slip op. at 22 (E.D.Pa. May 12, 2003) (Bartle, J.) (awarding a 44% allocation to one law firm).

cured transactions, finance, Swiss law, and international tax law. Finally, counsel engaged in extremely complex negotiations with many parties and many plaintiff factions. Absent this class action, most individual claimants would lack the resources to litigate a case of this magnitude. "Attorneys who take on class action matters serve a benefit to society and the judicial process by enabling . . . claimants to pool their claims and resources" to achieve a result they could not obtain alone. *Telectronics*, 137 F.Supp.2d at 1043. Furthermore, it is clear that "the global settlement negotiated by Counsel in this case is providing benefits to a class of people who are very much in need of help." *Bowling v. Pfizer, Inc.*, 922 F.Supp. at 1282. The second *Ramey* factor also supports assessment of reasonable fee awards from the common fund.

### C. Services Rendered Were on a Contingent Fee Basis.

Many of the Fee Award applicants in this case "undertook this action on a contingency fee basis and made significant cash outlays to finance it." *Kogan v. AIMCO Fox Chase, L.P.*, 193 F.R.D. 496, 504 (E.D.Mich.2000) (discussing the third *Ramey* factor and entering common fund fee awards). "[C]ontingency fee arrangements indicate that there is a certain degree of risk in obtaining a recovery. Class and Plaintiffs' Counsel accepted this litigation on a contingency fee basis, evidencing their recognition of the risk in this case." *Telectronics*, 137 F.Supp.2d at 1043. Specifically, the applicants expended a total of over 50,000 hours toward efforts reasonably devoted to providing a common benefit to the entire class, and advanced over

$3.7 million in out-of-pocket expenses directed at providing a common benefit.[43] If this case had not resolved as it did, at least a few of these attorneys would have suffered serious financial set-backs.

The Agretelis Plaintiffs offer two arguments regarding the third *Ramey* factor. First, the Agretelis plaintiffs assert there was only a limited contingency, because "liability was admitted from day one." Objection at 4. This is not completely true; as was made clear at the Final Fairness Hearing, while the Sulzer defendants admitted there was a problem with their manufacturing process, it would still be difficult for a given plaintiff to prove this problem caused his injury in a particular case, and the Settlement Agreement explicitly provided that Sulzer made no admission or concession of liability or wrongdoing. Settlement Agreement at § 15.4. More important, the ultimate question is not merely what an attorney must prove to prevail at trial, but what is the risk an attorney will not obtain reimbursement for his efforts. In this case, even after the parties had reached their *initial* settlement agreement, the deal almost collapsed several times; it was not until February of 2002 that settlement was essentially assured and any meaningful contingency removed. Had this settlement not occurred, all of the attorneys' common benefit work, plus their efforts on behalf of their individual clients, would have generated little or no compensation. The receipt of fees by the Fee Award applicants was clearly contingent on the successful settlement and resolution of the litigation against *all* the defendants, and their success was most certainly contingent on many factors un-

---

**43.** The 57 applicants listed a total of 53,670 hours directed at providing a common benefit; the Court has credited 50,313 of those hours, pursuant to the guidelines recited above. The Court earlier awarded $3,741,969.11 in Common Benefit Expense Awards. *See* docket nos. 610, 611, 626. Of course, the applicants also spent a large amount of time and money that, although directed at providing a benefit only to an individual plaintiff (and not the entire class), was still spent on a contingent basis.

known and unknowable to these applicants when they first undertook their common benefit efforts.

■ The second argument offered by the Agretelis Plaintiffs regarding the third *Ramey* factor is that "class members are already paying a significant percentage of the settlement fund in attorneys' fees," and these contingent fees already serve as adequate common benefit compensation; thus, any common benefit fee awards to attorneys receiving contingent fee payments from the Settlement Trust should be "modest." Objection at 4–5. This argument must be examined in the context of the actual fee award percentages in this case relative to other, similar cases. "Generally, in common fund cases, the fee percentages range from 10 to 30 percent (10%–30%) of the common fund created." *Telectronics*, 137 F.Supp.2d at 1042. "[T]hroughout the Sixth Circuit, attorneys' fees in class actions have ranged from 20%–50%." *Manners v. American General Life Ins. Co.*, 1999 WL 33581944 at *29 (M.D.Tenn. Aug.11, 1999) (collecting cases). In this case, the parties agreed that the total of all common benefit attorney fee awards would be "up to a maximum of $50.0 million." Settlement Agreement § 5.4. Given that the value of the entire settlement was at least $1.045 billion, the actual common benefit fee award percentage is less than 5.0%, which is probably the lowest such percentage awarded by any court in this Circuit in a class action case.

The Agretelis Plaintiffs are correct that many of the attorneys who applied for common benefit fees are also receiving payment of contingent fees from their clients, and a portion of these contingent fees are being paid by the Settlement Trust, as a benefit to class members. Again, the partial payment by the Settlement Trust of contingent fees owed by class members to their attorneys is, at least to some extent, a recognition that the attorneys' crafting of the settlement agreement, and/or advice to their clients to participate in the settlement agreement, provided a common benefit. Accordingly, it is fair to state that an *increment* of the total amount of contingent fees paid by the Settlement Trust reasonably could be construed as an award of common benefit fees, as well. Even if *all* of the contingent fees paid out by the Settlement Trust to the common benefit fee applicants are construed as a common benefit fee award, however, which would *not* be a reasonable construction, the total "percentage of the fund" paid to the fee award applicants would still be less than 12%—still well within the range of percentages seen in other cases.[44]

On this last point—the range of awards seen in other cases—this Court finds instructive *In re Cendant Corp. PRIDES Litigation*, 243 F.3d 722 (3rd Cir.2001), *cert. denied sub nom Kirby McInerney &*

---

44. This 12% figure (which is almost certainly too high) is based on an estimate of the sum of: (1) the total amount the Common Benefit Fee applicants state they expect to receive from the Settlement Trust as contingent fee payments, plus (2) the total of the Court's Common Benefit Fee Awards, including an estimated amount of awards that are currently being withheld. Counsel for the Agretelis Plaintiffs does not suggest that the Court should count as a common benefit fee award the *total* amount of contingent fees paid out by the Settlement Trust to *all* attorneys, but does suggest the Court should count as a common benefit award at least *some* of the contingent fees paid out by the Settlement Trust to the 57 fee award applicants. For example, counsel for the Agretelis Plaintiffs themselves has, to date, received from the Settlement Trust over $1.25 million in contingent attorney fee payments, which the Court is *not* counting as a common benefit fee award.

*Squire, LLP v. Joanne A. Aboff Family Trust,* 534 U.S. 889, 122 S.Ct. 202, 151 L.Ed.2d 143 (2001) (*"Cendant"*). In *Cendant,* the Third Circuit Court of Appeals reviewed "the range of attorneys' fee awards in common fund settlements of class actions." *Id.* at 736. The *Cendant* court noted that "district courts setting attorneys' fees in cases involving large settlements must avoid basing their awards on percentages derived from cases where the settlement amounts were much smaller" because, "absent unusual circumstances, the percentage [should] decrease as the size of the fund increases." *Id.* (quoting *Court Awarded Attorney Fees, Report of the Third Circuit Task Force,* 108 F.R.D. 237, 242 (1986)). The *Cendant* court then "set forth a chart of fee awards given in federal courts since 1985 in class actions in which the settlement fund exceeded $100 million and in which the percentage of recovery method was used." *Id.* at 737 (footnotes omitted). This chart revealed that the common benefit fees awarded in mega-fund cases, when measured as a percentage of the fund, ranged from 2.8% to 36.0%, with more than half of the cases measuring at 10.0% or more. Of the three cases where the settlement fund exceeded $1 billion, the percentages measured 8.275%, 5.0%, and 7.0%. Another such case (not cited by the *Cendant* court) awarded 14% in common benefit fees from

a settlement fund of $1.027 billion. *In re NASDAQ Market–Makers Antitrust Litigation,* 187 F.R.D. 465 (S.D.N.Y.1998). *See also Telectronics,* 137 F.Supp.2d at 1043, 1053 (entering a total of about $19.5 million in common benefit expense and fee awards from a $62.5 million total settlement fund, or about 31%, in a nationwide medical device class action settlement); *In re Orthopedic Bone Screw Products Liability Litigation,* 1994 WL 923395 (E.D.Pa. Dec.14, 1994) (MDL no. 1014) (entering a 12% common benefit fee award from a $100 million total settlement fund in a nationwide medical device class action settlement). These cases convince this Court that the arguments put forth by the Agretelis Plaintiffs are not well-taken.[45]

Ultimately, the third *Ramey* factor does weigh in favor of awarding common benefit fees. As the parties agreed in their Final Settlement Agreement (before the Agretelis Plaintiffs ever raised the issue), "the Court [has] consider[ed] ... any contingent fee paid to a Common Benefit Attorney pursuant to Section 5.1 and Section 5.2 when making an award of a fee." Agreement at § 5.5.

### D. The Value of the Services on an Hourly Basis.

As explained above, especially in conjunction with the lodestar method of analy-

---

**45.** Just before the Court issued this Order, it received notice of the recent publication of a legal periodical that is highly instructive regarding lodestars, multipliers, and percentages in common fund class action cases. *See* Stuart J. Logan, Dr. Jack Moshman & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions,* 24 Class Action Reports (March–April 2003). The authors undertook a survey of the common benefit fee awards entered by state and federal courts between 1973 and the present, in 1,120 class action cases. The authors also parsed the common benefit fee awards by size of recovery, type of case, and time of award. Among

other things, the authors found that: (1) when measured as a percentage of the total recovery, common benefit awards (including both fees and expenses) averaged: (a) 18.4% across all 1,120 cases, (b) 15.1% across the 64 cases where the recovery exceeded $100 million, and (c) 16.1% across the 10 mass tort cases; and (2) the courts' effective multipliers averaged: (a) 3.89 across all 1,120 cases, (b) 4.50 across the 64 cases where the recovery exceeded $100 million, and (c) 2.97 across the 10 mass tort cases. These statistics confirm the Court's conclusion that the Common Benefit Fee Awards and Expense Awards it has entered in this case are reasonable.

sis, the Court has scrutinized the applicants' listings of hours worked, and also their hourly rates. The Court then reduced, when appropriate, both multiplicands when computing the appropriate lodestar for each applicant. The Court has used these calculations as one of the most important factors in its final determinations of each applicant's Fee Award. The total of the straight lodestar amounts (with no multiplier) claimed by the 57 applicants is $23,555,703.95. The total of the straight lodestar amounts (with no multiplier), after adjustments by the Court (that is, reductions of the number of hours billed as common benefit hours, and also reduction of certain hourly rates), is $17,594,723.20.

As a cross-check, the Court also examined the effective lodestar multipliers for each attorney to whom it has awarded a common benefit fee. In its analysis of common benefit fee awards in mega-fund cases, the *Cendant* court examined the effective lodestar multipliers in 13 of the 18 cases listed, where it could be calculated. The overall multipliers ranged from 1.0 to 32.7, and all but three of the cases used overall multipliers equaling 2.0 or more. *Cendant*, 243 F.3d at 737. In this case, the effective overall lodestar multiplier is about 2.4.[46] The Court has also compared the effective lodestar multiplier for *each* fee applicant to every other fee

applicant, to ensure internal consistency and the appropriateness of each fee award.[47]

In sum, the Court has been especially careful to account for the fourth *Ramey* factor in its Common Benefit Fee Award analysis.

*E. The Complexity of the Litigation.*

As is apparent from the Court's recitation of the history of this case, this litigation has been weighted with complexities. The domiciles of class members span the nation, with the law of each state carrying certain variables. Jurisdiction over the European defendants was, at best, questionable and, more realistically, highly unlikely. The sole American defendant teetered on the edge of being forced into bankruptcy. The plaintiff class, itself, was divided into factions, sometimes quite rivalrous. The relatively simple obstacles of organization of discovery and coordination of federal and state proceedings occasionally appeared nearly insurmountable. The litigation was hard-fought from the start and, at several junctures throughout the case, a settlement of this magnitude appeared almost inconceivable. The complexity and novelty of the factual and legal issues presented, and the settlement negotiations necessary to resolve those issues, were exceptional. *See Enterprise Energy*

---

46. This 2.4 effective overall multiplier compares the total of the Court's common benefit fee awards to the total of the fee applicants' *discounted*, "reasonable" lodestars, after the Court's reductions for excessive hourly rates and excessive hours. The effective overall multiplier is only 1.8, if comparing the total of the Court's common benefit fee awards to the total of the applicants' own, non-discounted, lodestar calculations.

47. The Court does not set out here its lodestar and multiplier analyses for *each* of the 57 fee applicants, for two reasons: (1) such a discussion would certainly "entangle[ ] [the Court]

in a time-consuming process" of discussing and comparing time sheets and the relative common benefit value of each attorney, which would not be a good use of the Court's limited resources, *Telectronics*, 137 F.Supp.2d at 1041–42; and (2) given that the actual fee awards for *each* applicant, when measured using an "effective lodestar/multiplier" analysis, fall within the range of awards found in other, similar cases, there is no reason to further justify an award. The chart attached to this opinion does, however, contain many of the Court's underlying figures and calculations.

*Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 249 (S.D.Ohio 1991) ("It is clear to this Court that this litigation was extremely complex and vigorously defended. The legal and factual issues were novel, and the subject matter itself was multifarious."). The final settlement agreement, which is intricate and lengthy, reflects the complexity of the case. *See Bowling v. Pfizer, Inc.*, 922 F.Supp. at 1282 ("Counsel were confronted with myriad complex legal and factual questions in bringing this action and in negotiating the settlement. The structure of the settlement agreement approved by the Court reflects this fact."). There can be no doubt that the fifth factor in the *Ramey* analysis is satisfied.

### F. The Professional Skill and Standing of Counsel.

Finally, in examining the sixth factor of the *Ramey* analysis, the Court is satisfied that the professional skill and standing of each applicant is consonant with the Court's award to that applicant of common benefit attorney fees. The Court has reviewed the attorney biographies and narratives of services performed, which were submitted by each applicant. This information served to confirm the Court's general impression that class counsel and the other attorneys who worked for the common benefit, particularly those on the Special State Counsel Committee, demonstrated superior professionalism and skill throughout the litigation. The observations made by the *Bowling* court apply equally in this case: "The professional skill and standing of both Class and Special Counsel is very high and no doubt had much to do with their ability to successfully negotiate the settlement agreement and then get it approved by the Court. Class Counsel is a leading attorney in the mass-tort arena and Special Counsel have extensive experience both in general product liability litigation and in litigating [medical device] cases. Likewise, the skill and standing of defendants' counsel in this case is very high." *Id.*

### G. Summary.

The Court has weighed the *Ramey* factors generally and also for each applicant. In addition, the Court has conducted a two-pronged analysis of the propriety of a common benefit fee award, using both the lodestar method and the percentage of the fund method, both on an overall and an individualized basis. Although this analysis was onerous, it leaves the Court with a high degree of confidence that each Fee Award it enters today, and also the total of those Fee Awards, truly reflect the proper and deserved compensation to each applicant for their "contribut[ion] to the creation of the Settlement Trust through work devoted to th[e] 'common benefit' of Class Members." Settlement Agreement at § 1.1(v) (docket no. 361). Ultimately, the Court is satisfied that its final determinations are reasonable and appropriate, and conform with the factual information contained in the Fee Award Applications and related materials, as well as with applicable law. Having conducted a careful review of all the factual data in light of the relevant standards, criteria, and Guidelines, the Court sets out its Common Benefit Fee Awards in the chart below.

Accordingly, pursuant to sections 5.4 and 5.6 of the Settlement Agreement, the Court **ORDERS** that the Attorney Fee Awards listed in the chart below "shall be paid to liaison Class Counsel, who shall distribute such amounts to [the appropriate] Common Benefit Attorneys," and the Attorney Fee Awards "shall be paid out of the [proceeds from the] CCI."

**IT IS SO ORDERED.**